# United States Court of Appeals
## For the First Circuit

No. 12-1292

KAMAL ALY,

Plaintiff, Appellee,

v.

MOHEGAN COUNCIL, BOY SCOUTS OF AMERICA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judge.

A. Neil Hartzell, with whom David A. Slocum and LeClairRyan, PC, was on brief for appellant.
Paul J. Caruso, on brief for appellee.

March 22, 2013

**TORRUELLA, Circuit Judge.** This appeal arises from a workplace discrimination suit filed by Plaintiff-Appellee Kamal Aly ("Aly" or "Appellee") against Defendant-Appellant Mohegan Council, Boy Scouts of America ("Mohegan Council" or "Appellant"), in which Appellee alleged that he was denied career advancement opportunities on account of his religion (Islam) and national origin (Egyptian-American). Following trial, the jury returned a verdict in favor of Aly. Mohegan Council filed a motion for judgment as a matter of law claiming that Aly failed to prove: (1) that Mohegan Council was an "employer" with the requisite fifteen or more employees under Title VII of the Civil Rights Act of 1964; (2) that the administrative charge with the Massachusetts Commission Against Discrimination ("MCAD") was timely filed; and (3) that sufficient evidence supported a finding of discrimination. The district court denied Mohegan Council's motion, and this timely appeal followed. After careful consideration, we affirm the district court in all respects.

## I. Background

**A. Factual Background**

Since the court is reviewing the district court's denial of Mohegan Council's post-verdict motion for judgment as a matter of law, we set forth the factual background, as supported by the record, "in the light most favorable to the verdict." Muñiz-Olivari v. Stiefel Labs., Inc., 496 F.3d 29, 35 (1st Cir. 2007).

Aly is an Egyptian-American Muslim who was employed by Mohegan Council, a local Massachusetts council chartered by the Boy Scouts of America ("BSA"). Aly worked for the Council between August 6, 2001, and October 19, 2005, when he resigned. Throughout the course of his employment, Aly received two professional development trainings -- Professional Development Learning I ("PD-LI") in December 2001 and Professional Development Learning II ("PD-LII") in 2003 -- and was subject to four annual evaluations, called "Performance Reviews," at the beginning of each year to review the year prior. During the events relevant to Aly's claim on appeal, he served as a District Executive responsible for oversight of four functions of the district operation: membership, program, unit service, and finance. Further, the Council has around 1,800 volunteers overall, and District Executives were also tasked with recruiting and motivating volunteers.

For Aly's first two years of employment, he received positive Performance Reviews. His 2001 Review gave him an overall performance rating of "expected performance," and noted that he was "very systematic in his approach to [his] position," was "very willing and eager to do anything that [was] asked of him," and "work[ed] well with all volunteers." While he received a "marginal performance" in the traditional membership category -- the district had a membership loss of 3.7% that year -- his performance in district operations was rated "significantly exceeds." His 2002

-3-

Review was likewise very positive, and his overall performance rating was "significantly exceeds." He received "significantly exceeds" ratings in the "membership" and "quality district" categories, and won the National Quality District Award. Finally, Aly received a "far exceeds" rating for his performance as the "TVSR Director" of the summer camp, achieving "2003 Staff objectives by December 31, 2002." The 2002 evaluation noted that he: "demonstrated great leadership in taking on the Summer Camping Director Position [three] months prior to camp and running a successful camp"; "work[ed] well with all volunteers in his district and on the Council Training Committee"; and "demonstrated good customer service in working to resolve issue[s] as they ar[o]se." In Aly's 2003 Review, he received an overall rating of "expected performance," and while he got an "unsatisfactory" rating for membership, he received a "significantly exceeds" rating for an increase in campers and troops at the summer camp and a "far exceeds" rating for popcorn sales, which increased by 20.3%.

In 2003 and 2004, Aly held Boy Scout recruitment meetings in mosques. In 2004 in particular, he expanded recruitment meetings into two mosques and two Islamic schools in Worcester. Up until the fall of 2004, open houses and recruitment meetings were usually held in schools and churches. Prior to Aly's organizing in the Muslim community, there were no Muslim scouts or volunteers that were part of Mohegan Council.

In the midst of these recruiting efforts, in February 2004, Aly became eligible for Professional Development III ("PD-LIII") training. The PD-LIII training was required for promotion to a Senior Executive Director position, and in order to attend, an employee would need to be recommended following completion of a Career Evaluation. Aly approached his supervisor, James Kennedy ("Kennedy"), about the training almost every week between February 2004 and August 2004. On August 30, 2004, Kennedy and Richard Trier ("Trier"), the Area Director for the Northeast Region of the Boy Scouts, conducted Aly's Career Evaluation. Based on all of the evaluation data, Kennedy and Trier recommended Aly to attend the PD-LIII training "within the next six months," indicating that Aly was "[r]eady to assume increased responsibilities as a senior executive after PD-LIII." Under all categories -- initiative, relationship with volunteers, cooperation, teamwork, attitudes, and commitment to scouting principles and objectives -- Aly was given a "satisfactory" rating. The Career Evaluation form required the supervisors to provide an indication of "what improvement [wa]s needed" if the employee received any "unsatisfactory" ratings. Aly received no "unsatisfactory" ratings, and no recommendations for improvement were listed on the form. However, the form did list a concern about Aly's relationship with volunteers -- "[c]oncern over follow-up w[ith] phone. Viewed as undependable [at] times" -- and mentioned in the "attitude" section that he could be "stubborn at

times," and "takes advice -- lack[s] follow through." At trial, Aly testified that he was only told of one instance when he did not properly respond to telephone calls from volunteers, and that involved an incident of "playing . . . phone tag with a volunteer." Regarding the "stubborn" comment, Aly testified that Kennedy "was upset because I was asking for my career evaluation to be done on time, and he didn't like that." For the other concerns listed, Aly stated that Kennedy neither offered examples of negative performance nor explained what the negative remarks meant.

At the same time that Aly was recommended for PD-LIII training, another professional scout working for Mohegan Council, Néstor Chevalier ("Chevalier"), was also reviewed and received a recommendation for PD-LIII training. Chevalier is a third-generation Lebanese Christian born in the Dominican Republic, and he began employment with Mohegan Council in February 2002, six months after Aly. Between 2002 and 2005, Chevalier received three Performance Reviews as well as a Career Evaluation, and his overall performance rating was, respectively, "expected performance" in 2002, "expected performance" in 2003, and "significantly exceeds" in 2004. While Chevalier got a solid review of "expected performance" in each of the relevant categories in his 2002 Performance Review, he received three "marginal performance" ratings in 2003 for membership, units, and popcorn sales as well as a "far exceeds" rating in urban scouting units, membership and

program administration. Despite the overall "significantly exceeds" rating for his 2004 Review, he received two "unsatisfactory" ratings in the "friends of scouting" and "chief scout executive's winner circle" due to decreased fundraising from the prior year, as well as membership and unit loss. Nevertheless, following Kennedy and Trier's recommendation that Chevalier receive PD-LIII training on January 13, 2005, he was sent three months later for said training in April 2005. Subsequent to the training and in the same year, he was promoted to Senior District Executive.

Unlike Chevalier, Aly was never sent to receive his PD-LIII training, and was thus never eligible to be promoted to Senior Executive Director. On January 27, 2005, Aly received his 2004 Performance Review, which gave him the worst rating he had received yet: an overall rating of "marginal performance." According to John Garee ("Garee"), Aly's supervisor following Kennedy's departure, a "marginal performance" rating means that an employee's performance is "the marginal, minimal level of performance acceptable in the position," but it does not indicate unacceptable performance. Garee testified that, according to the Boy Scouts' Staff Leadership Guidelines, Aly never got an unacceptable review. The evaluation noted that Aly had "given effective leadership to forming new units in the Islamic community." It also noted that Aly had a "strong commitment to the Scouting program."

At trial, Mohegan Council presented evidence that one of the non-discriminatory reasons for not sending Aly to the PD-LIII training was his declining performance. Specifically, the Council presented testimony by Kennedy, Garee, Trier and David Libbey, a volunteer member of the District Committee within the Council, regarding their understanding of the basis of Aly's more negative evaluations in his final year. Kennedy indicated that Aly's receipt of lower ratings was based on: a decrease in district membership, volunteer complaints of Aly's failure to return calls and be fully prepared for meetings, a decrease in popcorn sales, and a drop in summer camp attendance.

Garee replaced Kennedy as Aly's supervisor on August 22, 2005, almost a year after Aly was recommended for the PD-LIII training. Garee testified that Aly notified him that he did not think his 2004 Performance Review was fair, and that he felt he did not have a good working relationship with Kennedy. Garee further testified that Aly had expressed concerns to him that he had been treated unfairly by volunteers and camp staff members on the basis of the fact that he was Muslim. After he reviewed Aly's prior Performance Reviews and observed Aly as he presided over the district committee meeting in September 2005, Garee stated that his impression was that Aly appeared "disorganized," "considerably disengaged," and "wasn't well-prepared." Garee also testified that a promotion was not an option due to Aly's marginal performance

rating and his deficiency "in several areas" that needed work. Garee did, however, testify that he had never witnessed a situation where a district executive was recommended for PD-LIII training but was not provided it.

Garee met with Aly on September 8, 2005, after speaking with several of Aly's volunteers and conducting a field observation of Aly. At that meeting, according to Garee, he and Aly discussed Aly's background, performance, and the PD-LIII training and promotion. Aly testified that Garee told him that he was not sending him to the PD-LIII training because key volunteers in the district had told him that they did not want him anymore. As stated infra, Garee had testified that, prior to that September 8, 2005 meeting, Aly had expressed concerns to him about unfair treatment by volunteers and camp staff members because he was Muslim.

Garee offered to put Aly on a 90-day performance improvement plan ("PIP") starting October 1st to improve upon his declining ratings. PIPs ordinarily consisted of a mutually agreed upon action plan which established objectives and stated goals for improvement within a 90-day time frame. Garee, however, never provided Aly with a PIP, stating at trial that they did not have "that opportunity" and claiming that Aly was indecisive about his future career objectives. While the Boy Scouts' Staff Leadership Guidelines specify how to proceed if a staff member gives an

"unsatisfactory" performance, specifying that the "first step" after an unsatisfactory performance review "is to establish an improvement program," neither Kennedy nor Garee followed these Guidelines through the period of Aly's receipt of "marginal performance" ratings. Further, neither Kennedy nor Garee adhered to Guideline requirements to communicate in writing the following information to staff members with unsatisfactory performance reviews:

> 1. The reasons why performance is unsatisfactory.
>
> 2. What must be accomplished in a specific time frame (short-term critical achievements) to regain a satisfactory level of performance?
>
> 3. How long the performance improvement period will last. (The period is normally 90 days; rarely is it shorter, and it is longer for long service employees who have served the organization for at least five years.).
>
> 4. The support and resources the staff member can expect during the performance improvement period.
>
> 5. The consequences of failure to achieve satisfactory performance.

Upon being notified of Aly's concerns regarding discrimination, Garee did not conduct a formal investigation to determine if discrimination had in fact occurred as he did not regard Aly's complaint as a formal complaint. Garee also did not inform the human resources division of the Boy Scouts about Aly's complaints of discrimination. Garee did conduct informal

-10-

interviews with volunteers and also notified Trier of the issue at the time it was presented to him.

Aside from his declining work performance, Mohegan Council presented three additional non-discriminatory reasons for not sending Aly to the PD-LIII training. Specifically, Mohegan Council presented evidence that it had concerns regarding Aly's wavering commitment to the organization, presenting testimony by Garee indicating such concerns after learning of Aly's pursuit of other job opportunities with outside employers in late September 2005. The final two reasons were budgetary and timing-related. Regarding the budgetary issue, evidence was presented at trial that Mohegan Council did not have the funds to send Aly to the training. Between Aly's August 30, 2004 Career Evaluation and the end of 2004, Aly and Kennedy had conversations where, according to Aly, Kennedy told him that the Council could not afford to send him to the training. When Aly offered to pay for the training himself, Kennedy told him that the Council would not be able to give him a raise upon his return. When Aly offered to forego a raise upon his return, Kennedy still refused. Mohegan Council also presented testimony that it was not typical to send people to training in the Fall months -- the period most critical for member recruitment -- and, in any case, a strong performance by Aly in the Fall could bring up his membership numbers and thus improve upon his prior performance ratings.

On October 10, 2005, Aly e-mailed Garee to notify him that he would resign by December 31, 2005, if he did not get promoted to a higher position by then. Garee did not respond to this e-mail. On October 19, 2005, Aly sent Garee another e-mail notifying him in writing of his resignation from the position of District Executive. Garee accepted his resignation by e-mail on the same day.

## B. Procedural History

On June 2, 2006, Aly met with Maritza Reyes of MCAD and filled out a "General Employment Interview Form" ("Interview Form") alleging that Mohegan Council discriminated against him on the basis of his race, religion, and national origin. Under "[d]ate of the last discriminatory act," Aly listed October 19, 2005, the date of his resignation, and indicated that the basis for his discriminatory complaint was denial of promotion, terms and conditions, retaliation and being "force[d] to resign." The Interview Form had the appearance of an intake form but is described in its body as an "employment complaint." In the factual predicate section of the Interview Form, Aly listed the following allegations: Kennedy "[h]arrassed" him to quit and refused to perform a timely career evaluation after 30 to 36 months of his employment; Néstor Chevalier's career evaluation was performed soon after he reached the thirtieth month of his hiring date; and Aly

-12-

never received the PD-LIII training for which he was recommended while Chevalier did receive it.

On August 18, 2006, Aly filed a formal complaint with MCAD identifying Mohegan Council as his discriminatory employer. On April 4, 2008, MCAD issued an order dismissing Aly's MCAD complaint for lack of jurisdiction for having been "untimely filed" after the requisite 300 days of the alleged discriminatory act: October 19, 2005, when Aly tendered his written resignation.

Aly then filed the instant case in the U.S. District Court for the District of Massachusetts on May 23, 2008. Before trial, Mohegan Council filed a motion for summary judgment, arguing that the requisite administrative filing with MCAD was not timely. The district court denied that motion on the grounds that: (1) Aly's June 2, 2006 Interview Form constituted a "complaint" for the purposes of the statute of limitations, and (2) Aly's August 18, 2006 formal complaint was merely an amendment to his June 2006 complaint which could properly relate back to it under MCAD regulations.

Trial commenced in September 2011, and resulted in a jury verdict in favor of Aly. Following the district court's denial of Mohegan Council's motion for judgment as a matter of law, it filed the instant timely appeal.

## II.  Discussion

Since the timeliness of Aly's MCAD complaint and the number of employees who worked for Mohegan Council are threshold issues for a Title VII action, we address them first, each in turn. We then review the merits of Aly's discrimination claim.

## A.  Timeliness of Aly's MCAD Complaint

To bring a civil action for employment discrimination pursuant to Title VII, an employee must first file a "charge" with either: (1) the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged unlawful employment practice; or (2) a parallel state agency -- in this case, MCAD -- within 300 days of said practice.  42 U.S.C. § 2000e-5(e)(1); Mass. Gen. Laws ch. 151B, § 5; Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005). An employee may only sue in federal court if the EEOC dismisses the administrative charge, does not bring civil suit, or does not enter into a conciliation agreement within 180 days of the filing of the administrative charge.  42 U.S.C. § 2000e-5(f)(1).  Failure to exhaust this administrative process "bars the courthouse door." Jorge, 404 F.3d at 564.

MCAD regulations provide the procedural guidelines for filing administrative charges following an alleged unlawful employment practice.  804 C.M.R. § 1.01 (1998).  Pursuant to those regulations, charges filed with MCAD must identify the complainant and the employer, contain the date on which the alleged conduct

-14-

occurred, and provide a concise statement describing the discriminatory conduct. Id. §§ 1.10(2), (4), (5). Additionally, the complaint must be signed and verified by the complainant under the pains and penalties of perjury. Id. § 1.10(4)(a). Where a filing within the statutory period is inadequate,

> [a] complaint . . . may be amended to cure technical defects or omissions, including failure to swear to the complaint, or to clarify and amplify allegations made therein. . . . Amendments shall relate back to the original filing date.

Id. § 1.10(6)(a); see also 29 C.F.R. § 1601.12(b) (Title VII requirements for amendment of charge and relation back). This "relation-back" principle applies, however, only when the earlier filing can be construed to operate as a "charge." Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1167 (10th Cir. 2007); see also Edelman v. Lynchburg Coll. ("Edelman II"), 300 F.3d 400, 403-04 (4th Cir. 2002); Pijnenburg v. W. Ga. Health Sys., Inc., 255 F.3d 1304, 1306-07 (11th Cir. 2001).

There has been significant debate concerning what constitutes a "charge" for the purposes of meeting the filing and verification requirements laid out by Title VII and the EEOC's regulations. In Edelman v. Lynchburg Coll. ("Edelman I"), 535 U.S. 106 (2002), the Supreme Court addressed the conflict among the courts of appeals regarding filing and verification requirements by first noting their differing purposes. The time-to-file limitation, the Court stated, was intended "to encourage a

-15-

potential charging party to raise a discrimination claim before it gets stale, for the sake of a reliable result and a speedy end to any illegal practices that prove[] out." Id. at 112-13. The verification requirement, on the other hand, had a distinct objective, namely, to "protect[] employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury." Id. at 113. "This object," the Court continued, "demands an oath only by the time the employer is obliged to respond to the charge, not at the time an employee files it with the EEOC. There is accordingly nothing plain in reading 'charge' to require an oath by definition." Id. In thus requiring an oath, the Court stated, "Congress presumably did not mean to affect the nature of Title VII as 'a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.'" Id. at 115 (quoting EEOC v. Commercial Office Products Co., 486 U.S. 107, 124 (1988)) (other citation omitted).

In Fed. Exp. Corp. v. Holowecki, 552 U.S. 389 (2008), the Supreme Court again considered what constitutes a "charge" in the context of an employment discrimination filing. Specifically, the Court attempted to resolve a dispute among the lower courts regarding whether the filing of an intake questionnaire may constitute the filing of a "charge" for purposes of the Age Discrimination in Employment Act (ADEA) if all other filing

-16-

requirements are met.[1]  Id. at 395-97.  The Court granted deference

to the EEOC's filing requirements, concluding that,

> [i]n addition to the information required by
> the regulations, . . . if a filing is to be
> deemed a charge it must be reasonably
> construed as a request for the agency to take
> remedial action to protect the employee's
> rights or otherwise settle a dispute between
> the employer and the employee.

Id. at 402.  In applying this rule, the Court looked at the label

and wording of the questionnaire at issue, noting that

> [d]ocuments filed by an employee with the EEOC
> should be construed, to the extent consistent
> with permissible rules of interpretation, to
> protect the employee's rights and statutory
> remedies.  Construing ambiguities against the
> drafter may be the more efficient rule to
> encourage precise expression in other
> contexts; here, however, the rule would
> undermine the remedial scheme Congress
> adopted.  It would encourage individuals to
> avoid filing errors by retaining counsel,
> increasing both the cost and likelihood of
> litigation.

Id. at 406.

The district court denied summary judgment as to the

timeliness of Aly's MCAD filing on the grounds that Aly's June 2,

2006 Interview Form, while defective in not including Aly's

signature, was a valid initial filing, and his subsequent formal

---

[1]  While Holowecki considered the question of what constitutes a charge under the ADEA, "the filing provisions of the ADEA and Title VII are virtually in haec verba, the former having been patterned after the latter."  Montes, 497 F.3d at 1164 n.6 (internal quotation marks omitted) (quoting Commercial Office Prods., 486 U.S. at 123-24).

charge filed on August 18, 2006, cured the technical verification defect and served as an amendment that "related back" to the original complaint.  Since that initial complaint was filed on June 2, 2006, within 300 days of Aly's October 19, 2005 resignation, it met the timeliness requirement.

While Mohegan Council does not dispute that Aly's Interview Form complies with the basic required content of an MCAD complaint -- stating the name and address of his employer, the person alleged to have discriminated against him, the alleged discriminatory conduct, and as well as the date of said conduct -- it makes three arguments as to why it was error for the district court to deem Aly's MCAD complaint timely.  First, Mohegan Council argues that, since the Interview Form did not bear Aly's signature and did not state the particulars surrounding the alleged discriminatory acts, it did not constitute a valid filing.  Since the "relation-back" principle could only apply to an initial valid filing, it could thus not be applied here to cure the deficiencies of the filed charge.  Second, Mohegan Council contends that the district court improperly relied on case law assessing the timeliness of charges filed with the EEOC, which does not require -- as MCAD regulations do -- that a charge include a signature and verification under the pains and penalties of perjury.  Finally, Mohegan Council claims that this court must defer to the MCAD

Investigating Commissioner's order that dismissed Aly's complaint as untimely filed.

We disagree on all counts. First, Aly's Interview Form may be construed as a valid charge to which the August 18, 2006 complaint may relate back under MCAD regulations. The Interview Form conformed with said regulations in that it: (1) listed the date on which the unlawful discriminatory act occurred: October 19, 2005 (see 804 C.M.R. § 1.10(5)(a)); (2) contained a concise statement of the alleged discriminatory acts: Kennedy's "harassment" and refusal to either perform Aly's Career Evaluation or send him to the PD-LIII training while another employee, Chevalier, received differential treatment as to the evaluation and training (see id. § 1.10(5)(b)); and (3) identified Kennedy as the person alleged to have committed the unlawful discriminatory act (see id.). While Aly's statement was not verified by his sworn signature subject to liability for perjury as required under Rule 1.10(4)(a), the rules provide an explicit remedy for such omission in Rule 1.10(6)(a), allowing for a complaint to be amended "to cure technical defects or omissions, including failure to swear to the complaint." (emphasis added).

Further, EEOC regulations and Supreme Court precedent endorsing said regulations allow an intake questionnaire such as Aly's to serve as a "charge" for the purpose of meeting the limitations period in appropriate circumstances. See Holowecki,

-19-

552 U.S. at 401-02; 29 C.F.R. §§ 1601.9, 1601.12, 1626.6, 1626.8. Those circumstances include cases where a Form may be "reasonably construed as a request for the agency to take remedial action to protect [a complainant's] rights or otherwise settle a dispute between the employer and the employee." Holowecki, 552 U.S. at 402. Holowecki provided indicia to assist in a court's inquiry as to whether a complaint may be reasonably construed as a charge, and those included labels on the face of the complaint. In Holowecki, the Court deemed a complaint insufficient to constitute a charge where said complaint was not labeled a "Charge of Discrimination," and its wording indicated that its purpose was to facilitate "pre-charge filing counseling." Id. at 405. Here, on the contrary, the Interview Form referred to the filing employee as a "Complainant" and contained wording referring to the Form itself in the present tense as an "employment complaint . . . being filed against the Respondent . . ." (emphasis added). It is thus reasonable to construe that language as a request for the agency to take action to protect Aly's Title VII workplace rights. Further, so construing the Interview Form is consistent with both the purposes of the limitations requirement as articulated in Edelman and the injunction in Holowecki to construe documents filed by employees, "to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." 552 U.S. at 406.

-20-

We cannot agree with Mohegan Council's contention that the August 18, 2006 complaint may not relate back due to its failure to meet the verification requirement. Firstly, regulations allowing relation back in cases where the earlier-filed complaint failed to fulfill a verification requirement have been upheld by the Supreme Court as reasonable. See, e.g., Edelman, 535 U.S. at 116-17 ("Where a statute or supplemental rule requires an oath, courts have shown a high degree of consistency in accepting later verification as reaching back to an earlier, unverified filing. . . . [and] Congress [is] presumed to have known of this settled judicial treatment of oath requirements when it enacted and later amended Title VII.") (internal citations and quotations omitted). Second, it is of no matter that the district court relied on case law assessing relation back of verified complaints filed with the EEOC rather than MCAD because, contrary to Mohegan Council's assertions, Section 706(b) of Title VII as a general matter requires all employment discrimination charges under its purview to "be in writing under oath or affirmation" for EEOC review, just as MCAD regulations do. 42 U.S.C. § 2000e-5(b) (2013). Thus, the district court did not err in relying on federal case law governing verification requirements under EEOC regulation 29 C.F.R. § 1601.12.

Finally, contrary to Mohegan Council's assertions, MCAD's Investigating Commissioner did not directly address the issue of

-21-

whether or not Aly's June 2, 2006 Interview Form constituted a "charge" under proper MCAD and EEOC guidelines. Rather, the Commissioner just assumed that the filing date of the charge was August 18, 2006, and dismissed that complaint as untimely without considering the question of whether said complaint may or may not relate back to the prior-filed Interview Form. Therefore, there was no agency determination made as to that issue to which this court may be asked to defer.

For the above-cited reasons, we hold that the district court did not err in finding Aly's MCAD complaint timely.

**B. Minimum Employee Requirement for Title VII Applicability**

Title VII defines an "employer," for the purposes of its mandate, as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b) (2013). Courts may rely on the "payroll method," or calculating the number of employees who are on the payroll for each day of a given week regardless of whether they were actually present at work each day, to determine whether an employer has reached Title VII's threshold number. Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 207 (1997); De Jesús v. LTT Card Servs., 474 F.3d 16, 21 (1st Cir. 2007). The payroll method allows for calculating the jurisdictional 15-employee threshold merely by knowing whether a particular employee was on

-22-

the payroll during a particular time frame, and it allows for the counting of part-time employees within said time frame to reach the threshold. See Walters, 519 U.S. at 207. Part-time workers are counted as employees for each day they worked between arrival and departure, and those times may be added to reach the threshold number. Id.; see 2 EEOC Compl. Man. (BNA), Directives Transmittal No. 915.003, § 2-III(B)(1)(a), "Employers" (May 2000). The plaintiff bears the burden of demonstrating by a preponderance of the evidence that the employer meets the 15-employee threshold. Arbaugh v. Y & H Corp., 546 U.S. 500, 516 (2006) (holding that "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue").

After hearing the testimony of Thanh Nguyen, the Council's office manager, and reviewing the Council's payroll records submitted into the record, the jury determined that Aly met his burden as to this threshold issue. The district court's opinion on Mohegan Council's motion for judgment as a matter of law found this determination to be "not unreasonable," and made the following deduction: in addition to the fourteen full-time employees of Mohegan Council, it was not unreasonable to find that a fifteenth employee, Quan Nguyen, was employed for twelve weeks and at least one of the seasonal workers was employed for eight

-23-

weeks, or that at least one of the seasonal workers worked year-round.

On appeal, Mohegan Council again challenges the sufficiency of Aly's evidence in showing that it employed the threshold number of employees during the period relevant for this action. Specifically, it contends that the evidence presented at trial could only allow a reasonable jury to speculate as to whether it had the requisite employees, and the jury could not reasonably conclude that, above and beyond its fourteen employees, an additional employee or employees of the 61 seasonal and part-time employees worked for more than twenty weeks because no particular evidence was provided as to who worked which weeks.

We review the district court's decision awarding a judgment as a matter of law de novo, but a jury's verdict "must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict]." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009) (quotations and citations omitted). The Court must affirm "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." Id. (quotation marks, quotations and citations omitted). We find that, viewed in the light most

-24-

favorable to the verdict, Mohegan Council met the threshold number of employees to constitute an "employer" for Title VII purposes.

It is undisputed that Mohegan Council employed fourteen employees full-time for a period of at least twenty weeks during the relevant period, and that another employee, Quan Nguyen, was employed for twelve weeks. Therefore, Aly only needed to show that, amongst the hours that 61 seasonal and part-time employees worked for Mohegan Council, eight remaining weeks of work could be compiled by a single employee or a combination thereof. The evidence of payroll and time cards submitted into the record show that most of the 61 part-time or seasonal workers were employed during the seven-week summer camp. A reasonable jury could find, based on this evidence, that any one or combination of the sixty-one employees filled the eight-week gap between Quan's employment and the requisite twenty-week threshold. Therefore, the district court did not err in denying Mohegan Council's motion for judgment as a matter of law as to whether it met the threshold number of employees.

## C. Evidence of Discrimination

To successfully bring a Title VII claim, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. Goncalves v. Plymouth Cnty. Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011). To set out a prima facie case, a plaintiff bears the burden of showing that (1)

he or she is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his or her job; (3) was nevertheless dismissed or otherwise suffered an adverse employment action at the hand of his or her employer; and (4) his or her employer sought someone of roughly equivalent qualifications to perform substantially the same work. Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005) (citation omitted).

Under the well-known McDonnell Douglas burden-shifting framework, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), once a plaintiff has proven his prima facie case by a preponderance, the burden shifts to the defendant to rebut the presumption of discrimination by providing legitimate, non-discriminatory reasons for their action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). If the defendant proffers legitimate reasons for the adverse action, the plaintiff must then prove by a preponderance that the proffered reasons by the defendant are a pretext for unlawful discrimination. Id. at 507-8. To meet his or her burden, a plaintiff must demonstrate either that the adverse employment action was (1) "more likely motivated" by discrimination than by the explanation proffered by the defendant; or (2) "the proffered explanation [was] unworthy of credence" where the suspect action, coupled with evidence to the

-26-

contrary, suggests a discriminatory motivation.  Burdine, 450 U.S. at 256.  Disparate treatment may be "competent proof that the explanation given for the challenged employment action was pretextual, provided the plaintiff-employee can make a preliminary showing that others similarly situated . . . in all relevant respects were treated [more advantageously] by the employer." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 43-44 (1st Cir. 2001) (quotation marks, quotations and internal citation omitted).

Although the burdens shift between the plaintiff and the defendant during the course of an employment discrimination claim, the ultimate burden of persuading the trier of fact lies with the plaintiff.  Burdine, 450 U.S. at 253.  Once an employment action has been submitted to a jury and tried on its merits, the burden-shifting framework is confined to the ultimate question of discrimination.  Sánchez v. P.R. Oil Co., 37 F.3d 712, 720 (1st Cir. 1994) ("[t]o focus on the existence of a prima facie case after a discrimination case has been fully tried on the merits is to 'unnecessarily evade the ultimate question of discrimination vel non.'") (internal citations omitted).  This is because, at that stage, McDonnell Douglas has served its purpose, and the evaluation of a post-trial motion assesses whether the plaintiff met his overall burden of establishing discrimination.  Id.

A defendant is entitled to judgment as a matter of law

if the record conclusively revealed some other, nondiscriminatory reason for the

> employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred.

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000). Further, as stated above, the jury's verdict is given high deference unless the evidence in the record, taken in the light most favorable to the non-movant, is so overwhelmingly inconsistent with the verdict that no reasonable jury could come to the same conclusion. Muñiz-Olivari, 496 F.3d at 35; see also Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001) (holding that verdict must stand unless evidence points unerringly to the opposite conclusion).

Mohegan Council makes three main arguments on appeal. First, it claims that Aly failed to establish a prima facie case of discrimination. Specifically, the Council argues that Aly failed to provide sufficient evidence either that his performance was up to its legitimate expectations or that it took an adverse employment action against him since he was not entitled to the PD-LIII training and voluntarily resigned. Further, the Council contends that Aly failed to show discriminatory intent, particularly because their Separation Notice with Aly indicated their willingness to take him back.

Second, and assuming this court finds that Aly established a prima facie case, Mohegan Council argues that a

reasonable juror could not find discrimination because of the unrebutted evidence it presented establishing that it had multiple, legitimate non-discriminatory reasons for promoting and training Chevalier rather than Aly.  Mohegan Council insists that Aly's evaluations in his first two years were outstanding, demonstrating that his religion and national origin were not factors in his assessments, and that when his performance declined, Aly did not dispute that his performance reviews were weaker, signing the relevant portions thereof without objection.  Further, they point to evidence cited <u>infra</u> regarding negative performance, the difficult timing of the PD-LIII training due to Fall recruitment efforts, and Aly's indecisiveness about his long-term prospects with the Council.

Finally, Mohegan Council argues that Aly failed to rebut its evidence by sufficiently showing pretext.  It claims that Aly's evidence that he felt he was being treated differently by other staff members and volunteers is insufficient to show that its proffered non-discriminatory reasons are untrue.[2]

---

[2]   Mohegan Council also argues in its opening brief that the district court erred in its memorandum and order denying judgment as a matter of law when it examined evidence without regard to the burden-shifting framework presented in <u>McDonnell Douglas</u>. However, Mohegan Council misstates the law in this Circuit when it claims that the strict, step-by-step <u>McDonnell Douglas</u> burden-shifting framework applies when reviewing the sufficiency of the evidence following a jury verdict.  As stated <u>supra</u>, once an employment discrimination action has been submitted to a jury, "the burden-shifting framework has fulfilled its function" since "backtracking serves no useful purpose." <u>Sánchez</u>, 37 F.3d at 720.  As we noted

While it is a close case, we agree with the district court that Mohegan Council did not meet its burden in showing that the evidence in the record, taken in the light most favorable to Aly, is so overwhelmingly inconsistent with the verdict that no reasonable jury could come to the same conclusion.

As to the Council's argument regarding Aly's prima facie case, while it is true that Aly's performance evaluations declined in his last two years of employment, the lowest evaluation mark his supervisor ever gave him was within his employer's work expectations. Further, it is reasonable to believe that Aly was performing to those legitimate expectations if his worst evaluation both recommended him for the PD-LIII training and suggested that he was "successful in every component of the job." In fact, Aly's most negative evaluations were issued during the period when he held recruitment meetings in mosques to expand recruitment into the Muslim community. Thus, the jury could reasonably infer that there

_____

in Sánchez, "[t]o focus on the existence of a prima facie case after a discrimination case has been fully tried on the merits is to 'unnecessarily evade[] the ultimate question of discrimination vel non.'" Id. (quoting U.S. Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 713-14 (1983)). Thus, the district court did not err when it considered the evidence presented as a whole rather than piecemeal, in a step-by-step review. In any case, the district court did, in fact, consider the evidence presented by Aly in determining whether the non-discriminatory reasons proffered by the Council constituted pretext. Specifically, it found that the Council's proffered evidence was "not so one-sided that no jury could reasonably find that discrimination occurred," noting that much of Aly's evidence to counter the Council's non-discriminatory reasons depended on credibility determinations that the jury made in Aly's favor.

was a correlation between said recruitment and his negative evaluations, an inference that goes directly to Aly's discrimination claim.

As to the Council's adverse employment actions, Aly presented sufficient evidence that the delay in being evaluated for recommendation to the PD-LIII training program and the Council's refusal to send him to the PD-LIII training once recommended, resulting in his ineligibility for a promotion, were adverse. See Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004) (stating the elements of a failure-to-promote claim). The record also indicates that Garee, Aly's supervisor at the time, was unable to identify a single person in his thirteen-year history of affiliation with the Boy Scouts who had passed the same benchmarks as Aly but was not sent to the PD-LIII training.

Finally, Aly sufficiently showed that the Council sought someone of roughly equivalent qualifications -- namely, Chevalier -- to send to the PD-LIII training and perform the work of a Senior Executive Director following a promotion for which the training made him eligible. Chevalier was a non-Muslim of Hispanic and Lebanese descent who started working at the Council six months after Aly began. Even though Chevalier had received "exceptional marks" on his evaluations prior to being sent to the PD-LIII training program, he was similarly situated to Aly in all relevant respects. His performance reviews were almost equivalent to those

of Aly, and while he received higher performance scores than Aly in certain categories and overall, he received lower performance scores than him in certain categories in 2003 and 2004.

While Mohegan Council offered a number of reasons it did not send Aly to the PD-LIII training -- his declining work performance, his wavering future commitment to the organization, a lack of financial resources to either send him or raise his salary following any promotion, and the timing of the training -- this evidence was not so overwhelmingly inconsistent with the jury's verdict as to require reversal. While Aly's proffered evidence of discrimination was not extensive, it could reasonably lead to an inference of discriminatory intent and a showing of pretext, particularly since it: (1) provided a direct challenge to the alleged non-discriminatory reasons as to job performance; (2) revealed consistent Performance Reviews noting Aly's commitment to the Council, with the only statements indicating otherwise occurring after Aly notified Kennedy about his concerns about discrimination; (3) indicated the Council's failure to follow Guidelines in dealing with negative Performance Reviews, if said reviews did in fact indicate performance so unsatisfactory as to warrant a failure to commit to a precondition for promotion; (4) revealed that Garee had relied at least in part in his decision not to send Aly to the training on volunteers, persons that Aly had complained were discriminating against him on the basis of

religion; and (5) demonstrated that the Council was willing to forego its budgetary concerns regarding the PD-LIII training when it came to Chevalier, but not when it came to Aly. Therefore, a reasonable jury could conclude that Mohegan Council's proffered nondiscriminatory reasons are not worthy of credence, and taken together with the other circumstances, suggest that discrimination was more likely the motivation behind the adverse action.

### III. Conclusion

We conclude that the district court did not err in denying Mohegan Council's motion for judgment as a matter of law. We accordingly affirm on all counts.

**Affirmed.**