Hubbard v. Tyco Integrated Cable Sys.   10-CV-365-LM    12/3/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Greg Hubbard

    v.                                    Civil No. 10-cv-365-LM
                                       Opinion No. 2013 DNH 165 P
Tyco Integrated Cable
Systems, Inc.


O R D E R

Greg Hubbard, a former employee of Tyco Integrated Cable Systems, Inc. ("Tyco") who was born and raised in England, is suing Tyco in five counts. He asserts: (1) two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; and (2) three claims under New Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. ("RSA") ch. 354-A.[1] Hubbard claims that he was subjected to a hostile work environment because of his national origin, and that Tyco terminated his employment because of his national origin and in retaliation for his complaints about discrimination in the workplace. Before the court are: (1) Tyco's motion for summary judgment; (2) Tyco's motion to strike certain material from Hubbard's Supplemented Memorandum of Law in Support of Objection to Defendant's Motion for Summary Judgment; and (3) Hubbard's Motion to Correct the Record. Each motion is duly opposed. The

---

[1] Hubbard initially asserted, but has since given up, a claim invoking 42 U.S.C. § 1981.

court heard oral argument on the motion for summary judgment on November 1, 2013. For the reasons that follow, Tyco's motion for summary judgment is granted in part and denied in part, its motion to strike is denied as moot, and Hubbard's motion to correct the record is granted.

## Motion to Strike

Tyco moves "the Court [to] strike from the summary judgment record all conclusory allegations and improbable inferences that Plaintiff . . . has failed to substantiate with competent evidence." Def.'s Mot. to Strike (doc. no. 51) 1. In support of that request, Tyco asserts that: (1) Hubbard's Supplemented Memorandum of Law in Support of Objection to Defendant's Motion for Summary Judgment, document no. 56, includes factual references that lack any record citations; and (2) in various places where the memorandum does include record citations, the record does not support the proposition for which Hubbard has cited it. The court shares many of Tyco's concerns. However, because the background section in this order draws from Hubbard's memorandum only facts that are adequately supported by the record, Tyco's motion to strike is denied as moot.

## Motion to Correct the Record

Hubbard also moves the court to take note of: (1) several corrections of erroneous citations to the record in his supplemented memorandum of law; and (2) one correction to a statement he made at oral argument. With respect to Hubbard's correction of citation errors, his motion is granted. In his second request, Hubbard asks the court to allow him to replace his representation, at oral argument, that he had not previously challenged the authenticity of a statement purportedly written by Christopher Long, and produced by Tyco in support of its motion for summary judgment, with a representation that he had, in fact, challenged the authenticity of that statement. Hubbard's second request is also granted, but in light of Tyco's submission of an affidavit from Long that authenticates his written statement, see doc. no. 68, Hubbard's authenticity challenge is, in the end, unavailing.

## Motion for Summary Judgment

### A. Summary Judgment Standard

"Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" McGair v. Am. Bankers Ins. Co. of Fla., 693 F.3d 94, 99 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a); citing Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96

(1st Cir. 2011). "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 30 (1st Cir. 2011) (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006)). "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is

4

insufficient to discharge the nonmovant's burden.'" Sánchez-Rodríguez, 673 F.3d at 9 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)). "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

## B. Background

Unless otherwise indicated, the following facts are undisputed.

Hubbard spent his childhood in England and speaks with a British accent. In the fall of 2007, he began working for Tyco as a T3 Operator, which was an entry-level position. While working as a T3 Operator, Hubbard experienced no discrimination based upon his national origin.

In November of 2007, Hubbard was promoted to the position of T1 Inspector. In that position, he inspected the work of operators in Tyco's Repeater Assembly Building ("RAB"). Before he accepted the promotion, some of his co-workers advised him not to accept it, and warned him that inspectors were generally given a hard time by the operators whose work they inspected. After Hubbard was promoted, he became the target of hostile

comments from several operators who referred to his national origin in the following ways:

- After Hubbard rejected a part made by Derek Thompkins, Thompkins called him an "English mother" and a "limie fuck." Def.'s Statement of Undisputed Material Facts (hereinafter "Def.'s Facts"), Ex. D, Hubbard Dep. (doc. no. 32-4) 122:4, 11.

- Linda Tarnawski told an employee Hubbard was training: "[Y]ou don't want to learn anything from him. He's an English fuck up. He don't know what he's talking about. What would he know if he's English anyway." Id. at 126:14-17.

- Tarnawski left notes on parts saying "have the English guy not inspect this," id. at 126:23, and "[d]on't let the English guy touch it," id. at 127:17-18.

- Katherine Merrill once told an employee Hubbard was training: "you don't want to listen to that English faggot because he doesn't know what he's talking about." Id. at 129:11-13.

- After Hubbard called out Bill Rogers for his conduct toward a co-worker of Asian descent, Rogers said: "Mind your fucking business . . . you English faggot." Id. at 135:1-10.

- Rogers said things about Hubbard's national origin daily, see id. at 135:14-15, once wrote "English faggot" in the condensation on a window in a door that Hubbard frequently used, id. at 135:20, and once referred to Hubbard as "that English faggot right there," id. at 136:17.

Some Tyco employees resented Hubbard because he was new, had been promoted quickly, held authority, was good at his job, was a hard worker, and worked a large amount of overtime. Moreover, the operators who made comments that included references to

6

Hubbard's national origin often did so in the context of challenges to his status and performance as an inspector.

In late December of 2008, Hubbard was involved in an altercation with Bill Rogers, an operator. Both Hubbard and Rogers were suspended, and Hubbard was issued an Employee Warning Notice ("Warning") that provided, in pertinent part:

> On Wednesday, 12/24/2008 you were suspended for one (1) week after an altercation with Bill Rogers on Tuesday, 12/23/2008 that resulted in you having inappropriate conversations with fellow inspectors and operators regarding the incident after you spoke with your manager and HR. Whenever you are privy to certain information, especially information regarding an ongoing investigation, you need to keep those facts to yourself and not spread that information to fellow employees. This type of behavior creates animosity with fellow employees.

Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2. The Warning was signed by: (1) Hubbard; (2) his supervisor, Frank Faria; and (3) two managers: Craig Murphy, who was Tyco's director of quality and testing, and Joe DeRoy, Tyco's human resources manager. See id. Finally, the Warning provided that it would remain in effect until June 28, 2009. See id.

On January 11, 2009, Hubbard sent Faria an e-mail in which he withdrew a previous request for a transfer to a different department. That e-mail stated, in pertinent part:

> I love my job and always have, I would love to stay here and continue my job, as long as if any situation comes along and I continue to do the right thing and tell the appropriate people it gets taken care of. It

7

is not fair that I have to deal with some of these situations due to being very open minded, and blunt with people.  . . .  The only concern I have is others trying to get me out of here and its going to be hard to deal with that on a daily basis, but I can handle it and always have been able too.

Pl.'s Mem. of Law, Ex. 6 (doc. no. 39-7), at 13.

On February 4, 2009, Hubbard met with DeRoy and Murphy. While the purpose of that meeting is disputed, it is undisputed that: (1) Murphy, DeRoy, and Hubbard discussed a variety of workplace issues of concern to Hubbard; and (2) during the meeting, DeRoy asked Hubbard to put his concerns in writing so they could be investigated and dealt with.  DeRoy prepared a memorandum to the file to document the meeting.  Most relevant to the claims in this case, DeRoy noted that Hubbard mentioned negative comments directed toward him, disrespectful behavior, off-color jokes in the break area, and failures by management to correct those problems.  DeRoy's notes do not indicate that Hubbard complained about discrimination based upon his national origin.

The day after DeRoy and Murphy met with Hubbard, Tyco employee Christopher Long provided a statement, at the request of Tyco management, concerning conversations he had had with Hubbard.  Among other things, Long reported:

Greg, has confide[d] in me multiple times associated with work related issues where he seemed to be having problems . . . .  After his recent suspension over the

8

conflict with Bill Rogers, he approached me to give his side of the story. . . . During that conversation I told him that he is on everyone's radar and that he needed to avoid further confrontations, that he's now the common denominator in multiple issues that have taken place. After I gave him that speech, he started talking about how he is being discriminated against because he's English, and if this were any other company Bill would have been fired. Again I suggested he stay on the straight and narrow for a whole, avoid confrontation.

The last two weeks I have not been able to go into RAB without being confronted by Greg with more gossip associated with this type of perpetual conflict.

Most recently on the evening of 2/4/09, Greg, saw me having a conversation with Kevin Coughlin . . . . After Kevin walked away Greg asked me if we were talking about him (he appeared paranoid), I replied no. He said that he had to talk to me about something outside and portrayed it as very dramatic, which made me nervous. Once we were outside Greg started talking about Charles Pixley, Scott Williams and how he has documented them keeping things behind closed doors; he also suggested their jobs could be on the line and that he didn't have a lawyer, but was thinking about getting one (something to that effect). I didn't know where the conversation was going or coming from, I was uncomfortable, and I withdrew from the conversation. Within five minutes I went to Kevin Coughlin to let him know what Greg was saying.

Vanderzanden Aff., Ex. 10 (doc. no. 34-10), at 2.

After his February 4 meeting with DeRoy and Murphy, Hubbard prepared an undated statement listing twelve incidents that concerned him. Most relevant to the claims in this case, Hubbard's list included: (1) a January 2008 incident in which Bill Rogers "attacked Putu Widiartha with verbal abuse," Vanderzanden Aff., Ex. 4 (doc. no. 34-4), at 2; (2) a March 2008

9

incident in which Derek Thompkins "attacked [him] with verbal abuse after a part was rejected," id.; (3) a July 2008 incident in which Rogers told ethnic jokes that made an Indonesian woman cry, see id.; (4) a July 2008 incident in which he overheard Linda Tarnawski use profane language while talking about him to another inspector, see id. at 4; (5) an August 2008 incident in which he "was verbally attacked by Derek Thompkins over a rejected part again," id. at 3; (6) a second August 2008 incident in which Thompkins "attacked [him] with verbal abuse," id.; (7) a September 2008 incident in which he overheard a conversation between Rogers and another employee in which Rogers "made a couple of (English) remarks as [he] walk[ed] by" and referred to him as "that English faggot," id.; and (8) the altercation with Rogers that led to his suspension, during which Rogers directed "profane language" toward him, id. at 4.

Hubbard says that he used the generic term "verbal abuse" rather than specifically reporting comments referring to his national origin because "DeRoy instructed [him] to leave out the 'name calling' or anything about his heritage." Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ V (p. 40) (citing Ex. 3, Hubbard Dep. (doc. no. 39-4) 190:2-6). Hubbard gave his written statement to DeRoy on either Friday, February 6, or Monday, February 9; the deposition testimony offered by both Hubbard and

10

DeRoy is ambiguous on this point.[2]  The record includes an

undated document authored by DeRoy, titled "Greg Hubbard's

charges – 2/09/2009" that addresses, point by point, the

incidents listed in Hubbard's written statement.  See

Vanderzanden Aff., Ex. 21 (doc. no. 34-21).

According to the statement of facts in Hubbard's

supplemented memorandum of law, he had another meeting with

DeRoy and Murphy.  The statement of facts continues: "Deroy

alleges that he asked Hubbard to respond in writing to Long's

allegations."  Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 61

(citing Ex. 1, DeRoy Dep. (doc. no. 39-2) 98:19-22, 105:7-13).

On February 6, Hubbard met with DeRoy.  DeRoy says that at

that meeting, he told Hubbard not to contact either Long or

Kevin Coughlin.  Hubbard says that DeRoy told him no such thing.

Either way, it is undisputed by Hubbard that at the February 6

---

[2] Compare Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no. 39-4) 79:22-80:4 ("We met, I believe, one more time after the text message [Hubbard sent Long on February 6] and that was the very next day that I [came] in and he had asked me to write everything down.  I did, and then was told to hand in my badge and I'm suspended pending investigation.") with id. at 183:2-5 ("I don't recall the day I gave it [his written statement] to [DeRoy].  He asked me one time and I gave it to him, I believe, the very next day [i.e., February 5], but I'm not sure of the date.").  In his own deposition, DeRoy stated that Hubbard gave him his written statement at their final face-to-face meeting on February 6, see id., Ex. 1, DeRoy Dep. (doc. no. 39-2) 110:15-111:4, 113:21-114:6, but also indicated that his last meeting with Hubbard took place on February 9, see id. at 168:20-23.

11

meeting, DeRoy: (1) spoke with him about his relationship with Long, see Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 68; and (2) immediately after speaking with Hubbard about Long, told Hubbard that he didn't "want . . . for any pot to be stirred," Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no. 39-4) 109:14.

After his meeting with DeRoy on February 6, Hubbard was involved in a conversation with Long, conducted by telephone and text message.[3]  Long described that conversation, in a letter to whom it may concern, dated February 9, 2009, in the following way:

> I was at my desk at 6:20 pm last Friday night (2/6/09) when Greg contacted me from an unknown number; he was extremely upset shouting at me and telling me I have "big balls" in regards to my written statement to Joe Deroy from the day prior.  I was nervous and hung up the phone.  I immediately contacted my manager John Towne at home.  He suggested I call Joe Deroy, which I did.
>
> After I notified Joe and John I received a text message from Greg that seemed aggressive and had a threatening tone, the text messages are the following:
>
> "d up not true story I cant believe it and u have the nerve to fucking lie WOW u r a brave man u and the other 1 to sit there and lie u sit there and try" Sent 2/6/09 at 6:37 pm
>
> "to get urself to look good with some bulshit lies against me and my family u have balls please show this to them so we can talk about everything that" Sent 2/6/09 at 6:37 pm

---

[3] Whether that communication was initiated by Hubbard or Long is a matter of dispute but, in the end, is immaterial.

12

"goes on monday: everything" Sent 2/6/09 at 6:38 pm.

After reading the text messages I called him right back to ask if he was indeed threatening me, he said he wasn't, I hung up the phone.

Vanderzanden Aff., Ex. 9 (doc. no. 34-9), at 2.

On February 12, 2009, DeRoy spoke with Hubbard by telephone and informed him that Tyco had decided to terminate his employment. It is undisputed that DeRoy told Hubbard he was being discharged for insubordination. The record includes DeRoy's notes on his telephone conversation with Hubbard. Those notes include the following relevant comments:

I told Greg the decision was to terminate employment based on insubordination by making contact with Chris Long against direct instructions from me not to do so and for inappropriate intimidating remarks to a member of management.

Greg started to explain his side of the story with the communication with Chris Long Friday evening 2/[6]/09. I explained that I had a signed written statement from Chris Long stating it was Greg who made first contact. I went on to explain to Greg, this was the same reason [he was] suspended on 12/24/2008 during the Bill Rogers incident. I explained he was instructed by me after our phone conversation on the 23rd of December not to say anything to anyone as there was an investigation ongoing and he went back to his area and told individuals that Bill Rogers was going to be suspended when he came in to work on the 24th and may even lose his job. Greg replied back "this is the only thing I did wrong during the entire ordeal." I went on to say, you contacted Chris Long Friday night 2/[6]/2009 and gave him an ear full. . . . I instructed you in my office Friday afternoon specifically not to contact anyone.

Vanderzanden Aff., Ex. 8 (doc. no. 34-8), at 2.

13

Based upon the foregoing, Hubbard claims that Tyco: (1) discriminated against him based upon his national origin by suspending him in December of 2008 and by discharging him, in violation of RSA 354-A:7, I (Count IV); (2) discriminated against him based upon his national origin by tolerating the existence a hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, I (Counts II and III); and (3) retaliated against him for opposing discrimination by discharging him, in violation of RSA 354-A:19 and 42 U.S.C. § 2000e-3(a) (Counts V and VI).

C. Discussion

Tyco moves for summary judgment on all five remaining counts of Hubbard's complaint. The court begins with Hubbard's hostile-work-environment claims and then turns to his discrimination and retaliation claims.

1. Hostile Work Environment (Counts II and III)

Counts II and III both assert that Tyco subjected Hubbard to a work environment permeated by hostility engendered by his national origin. Neither count specifies the conduct on which it is based but, rather, each incorporates, by reference, all the paragraphs that precede it. In the fact section of his

complaint, Hubbard identified the following acts of hostility at

Tyco that were based upon his national origin:

13. At the end of July or in early August the Plaintiff was training a new inspector named Brett Turgeon. Linda Turnowski, a friend of Mr. Rogers, approached Mr. Turgeon and told him "Don't listen to that stupid f---. He is an English idiot. He doesn't know what he is talking about."

14. Around the same time another of Mr. Rogers' friends, Kathy Merrill, told Mr. Turgeon "Don't listen to the English guy, he is an idiot."

. . . .

16. Following a rejection of one of Mr. Thompkins' parts, the Plaintiff overheard Bill Rogers tell Mr. Thompkins, "He's f---in English, what the f--- does he know?"

17. The harassment continued from the RAB Department. Small comments in the break room, minor annoyances with lunches etc. The comments were derogatory, referred to my being British, and were made loud enough so that I could hear them. The comments created an extremely hostile work environment for me.

18. In September 2008 the Plaintiff was in the break room. Mr. Rogers and his supervisor Charles Pixley were in the break room as well. They began talking about the Plaintiff in a derogatory manner. The Plaintiff did nothing for a few moments until Mr. Rogers said "You English Faggot". The Plaintiff reacted and asked what the problem was, but both Mr. Rogers and Mr. Pixley walked out of the break room.

. . . .

22. In December 2008, after reporting his concerns to Mr. Deroy, the Plaintiff passed Mr. Rogers in the RAB department. Mr. Rogers said something to the Plaintiff as he passed. He then turned and put his hands on the Plaintiff in a very threatening

15

manner and said, "I'm not going to fight you because you would beat me, but I am going to give you all the shit you deserve you English faggot."

Compl. (doc. no. 1) 3-4. In his supplemental memorandum of law, Hubbard appears to elaborate on the allegations in paragraph 17 of his complaint by quoting the following testimony from his deposition:

> Oh, every day, [Rogers] would say something every single day about my nationality and origin, every day. It would – he would even write notes and put them in the lunch cooler. And he would write things when it was cold outside in January, heat inside the building, you got the steam on the window, he would write English faggot on the door to go into RAB. Comments, I mean, there's such a long list of what that guy actually really said to me. I mean, the pride of my country, he would say things, you know, just about British people, about me, you know, about how he hated all of us. And if you weren't American you shouldn't be at this company, you shouldn't be working in America.

Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 19 (quoting Pl.'s Mem. of Law, Ex. 3 (doc. no. 39-4), at 135:14-136:4). It is undisputed that Rogers' comments did not begin until after Hubbard became an inspector.

Tyco argues that it is entitled to judgment as a matter of law on Hubbard's hostile-work-environment claims because the undisputed record demonstrates that Hubbard cannot establish two elements of those claims: (1) harassment that was based upon his national origin; and (2) harassment that was severe and

16

pervasive enough to alter the conditions of his employment. The court does not agree.

Count II arises under Title VII, while Count III arises under RSA 354-A. "Because the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A, the court will address [Hubbard's state and federal] claims together using the Title VII standard." Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011) (citing Madeja v. MPB Corp., 149 N.H. 371, 378 (2003); Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856-57 (1st Cir. 2008); Slater v. Town of Exeter, No. 07-cv-407-JL, 2009 WL 737112, at *4 n.5 (D.N.H. Mar. 20, 2009)).

"Title VII prohibits employers from discriminating against individuals 'because of [their] race, color, religion, sex, or national origin . . . .'" Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 n.5 (1st Cir. 2011) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Requiring a person 'to work in a discriminatorily hostile or abusive environment' violates Title VII." Gerald v. Univ. of P.R., 707 F.3d 7, 17 (1st Cir. 2013) (quoting Valentín-Almeyda v. Mun'y of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); citing Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is

17

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Torres-Negrón v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (quoting Harris, 510 U.S. at 21).

Turning to the elements of his claim, for Hubbard to prevail, he must show:

> (1) that [he] is a member of a protected class; (2) that [he] was subjected to unwelcome harassment; (3) that the harassment was based on [his] membership [in] the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of [his] employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Torres-Negrón, 488 F.3d at 39 (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001); Faragher v. City of Boca Ratón, 524 U.S. 775, 787-89 (1998)).

### a. Harassment Based on National Origin

Tyco argues that the undisputed facts of this case demonstrate that while Hubbard was subjected to verbal abuse by several operators, that abuse was based on his being an inspector, not his membership in a class protected by Title VII. Tyco has, indeed, produced undisputed evidence that nobody at Tyco called Hubbard names that referred to his national origin

18

before he was promoted.  See Def.'s Facts (doc. no. 32) ¶ 11; Pl.'s Supp. Mem. of Law (doc. no. 56) ¶¶ A & B (p. 36) (disputing paragraphs 8 and 11 of Tyco's statement of facts, but not disputing paragraph 11).  Moreover, not all harassment that mentions a person's membership in a protected class is necessarily based upon that status.  See, e.g., Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 191 (1st Cir. 2003).

Here, however, several factors counsel in favor of letting a jury decide whether Hubbard was harassed because of his national origin, or for some other reason.  First, Hubbard has produced evidence that references to his national origin were far more frequent than references to the plaintiff's religion in Rivera, which supports an inference that anti-English animus was much closer to the surface at Tyco than was the case for anti-Catholic animus in the workplace in Rivera.  Beyond that, a jury could reasonably see anti-English animus in all the name-calling that linked a reference to Hubbard's national origin with a derogatory reference to his intelligence or his sexuality.  In short, while a jury could conclude that Hubbard was harassed because he was an inspector, and his national origin was simply a tool his harassers could use to intensify their verbal attacks against him, the court concludes that the question of whether

19

Hubbard was harassed because he is English is best left to a jury.

### b. Severe or Pervasive Harassment

Tyco next argues that the harassment Hubbard endured was not "so severe or pervasive that it altered the conditions of [his] employment and created an abusive work environment," Torres-Negrón, 488 F.3d at 39. Regarding that element of Hubbard's claim, the Supreme Court has explained that there is no "mathematically precise test." Harris, 510 U.S. at 22. Rather,

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris, 510 U.S. at 23. None of the foregoing "factors is individually determinative of the inquiry." Ayala-Sepúlveda v. Mun'y of San Germán, 671 F.3d 24, 31 (1st Cir. 2012) (citation omitted); see also Gerald, 707 F.3d at 18 (citation omitted).

"Title VII does not create a general civility code for the workplace." Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Ríos-Jiménez v. Principi, 520 F.3d 31, 44 (1st Cir. 2008)). "The workplace is not a cocoon, and those who labor in

20

it are expected to have reasonably thick skins . . . to survive the slings and arrows that workers routinely encounter in a hard, cold world." Alvarado v. Donahoe, 687 F.3d 453, 462 (1st Cir. 2012) (quoting Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)). Accordingly, the basic "thrust of [the] inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005) (citing Faragher, 524 U.S. at 788).

Finally, "because the inquiry into the existence of a hostile work environment is fact specific, 'the determination is often reserved for a fact finder.'" Vega-Colón v. Wyeth Pharms. Inc., 625 F.3d 22, 32 (1st Cir. 2010) (quoting Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006)). Such is the case here.

With regard to frequency, Hubbard has produced evidence that, for some period of time – and the court may reasonably infer that period to span several months – he was subjected to daily verbal abuse from Rogers. While most of the alleged abuse was verbal, Hubbard has also produced evidence that, on one occasion, Rogers physically confronted him by bumping into him in the break room and trying to get chest-to-chest with him. See Pl.'s Mot. to Supplement, Ex. 1, Hubbard Dep. (doc. no. 48-

21

1) 330:17, 331:4. He has also produced evidence that, after his confrontation with Rogers in the break room, he began taking half days off from work, due to the stress engendered by the harassment he was enduring. See id. at 298:3-300:22. While Hubbard's ability to demonstrate that he was subjected to severe or pervasive harassment that altered the conditions of his employment is a close call, his evidence is not so deficient that the court may determine, as a matter of law, that his harassment was not severe or pervasive, as those terms are used in the context of Title VII.

### c. Summary

Tyco has advanced two arguments in support of its motion for summary judgment on the hostile-work-environment claims stated in Counts II and III. Because Hubbard has produced sufficient evidence to create trialworthy issues of fact concerning the cause for his harassment and its severity or pervasiveness, Tyco is not entitled to judgment as a matter of law on Counts II and III.

### 2. Discrimination (Count IV)

In his complaint, Hubbard frames his state-law discrimination claim in the following way:

22

42. The allegations set forth in paragraphs 1 through 42 [sic] above are reasserted in this count as if set forth separately herein.

43. The Defendant discriminated against the Plaintiff because of his national origin and the above conduct constitutes national origin discrimination in violation of RSA 354-A:7, I.

Compl. (doc. no. 1) 7. Nowhere, however, does Count IV specifically identify the conduct on which it based. In his supplemented memorandum of law, the only prima facie case Hubbard cites is the one for employment termination cases. See Pl.'s Supp. Mem. of Law (doc. no. 56) 19. Likewise, even a generous reading of Hubbard's supplemented memorandum suggests only a single discriminatory act, Hubbard's discharge.

Yet, at oral argument, Hubbard identified a second discriminatory act: Tyco's decision to suspend him in late 2008, for having inappropriate conversations with fellow inspectors and operators in the aftermath of his altercation with Bill Rogers. In the interest of giving Hubbard, the non-moving party, every reasonable advantage, the court will consider claims that Tyco violated Hubbard's rights under RSA 354-A:7, I, by: (1) suspending him in December of 2008; and (2) discharging him. Before turning to those two claims, however, I will outline the relevant law.

As with Count III, the court will analyze the state-law claims asserted in Count IV under the standard applicable to a

23

Title VII claim.  See Hudson, 822 F. Supp. 2d at 92.  Because Hubbard is "unable to offer direct proof of [Tyco's] discriminatory animus," his claim is subject to "the now-familiar three-step framework set forth in McDonnell Douglas." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 34-35 (1st Cir. 2012) (quoting Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995)).

Under the framework first outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "the plaintiff must [first] establish a prima facie case of discrimination." Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).  The prima facie case must be established "by a preponderance of the evidence." Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 46 (1st Cir. 2013) (citing Goncalves v. Plymouth Cnty. Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011)).  "Meeting the initial prima facie requirement is 'not especially burdensome.'" Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011) (quoting Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (describing burden of establishing prima facie case as "not onerous," "easily made," and a "small showing")).  "Once the plaintiff makes out a prima

24

facie case, the burden of production shifts to the defendant to produce evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." Cham, 685 F.3d at 94 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993); citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)) (internal quotation marks omitted).

"If the defendant produces such evidence [i.e., evidence of a legitimate nondiscriminatory reason for its employment action], the McDonnell Douglas framework 'disappear[s]' and the sole remaining issue is 'discrimination vel non,'" leaving the plaintiff "an opportunity to show that the reasons offered by the defendant were a pretext for discrimination." Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013) (quoting Cham, 685 F.3d at 94; citing Reeves, 530 U.S. at 143); see also Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010) ("If the employer [articulates a legitimate, non-discriminatory for its adverse employment action], the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory.") (citing Smith v. Stratus Computer, 40 F.3d 11, 16 (1st Cir. 1994)). Finally, "[t]he ultimate burden of persuasion always

25

remains on the plaintiff . . . ." Cham, 685 F.3d at 94 (citing Reeves, 530 U.S. at 143; Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 447–48 (1st Cir. 2009)).

### a. Hubbard's Suspension

The problem with entertaining a claim that Hubbard was suspended on account of his national origin is that there was nothing in his complaint to alert Tyco that he was making such a claim. Consequently, Tyco has framed no arguments to defeat that claim, and the court has little guidance as to how to analyze it. The only real clues to this claim appear under the heading "Disparate Treatment" in Hubbard's supplemented memorandum of law. In that section of his memorandum, in support of an argument that evidence of disparate treatment may prove that the explanation Tyco gave for discharging him was pretextual, Hubbard asserts that he was suspended for doing something that another Typo employee also did, without adverse consequences. Accordingly, the court will focus on that comparison as it applies the McDonnell Douglas framework to Hubbard's disparate-treatment claim arising from his suspension.

As noted, Hubbard has not identified the elements of a prima facie case of discrimination based upon an adverse employment action other than discharge. However, to establish a

26

prima facie case of discrimination based upon his suspension, Hubbard must show that he:

> (1) was a member of a protected class, (2) met the employer's legitimate job-performance expectations, (3) was [suspended], and (4) that [Tyco] . . . did not treat members of the protected class neutrally [when handing out suspensions].

Udo, 54 F.3d at 12 (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)). Bearing in mind that "'[t]he time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employer's articulated reason for having acted adversely to the plaintiff's interests,' as opposed to as part of a plaintiff's prima facie case," Cham, 685 F.3d at 94 n.4 (quoting Kosereis, 331 F.3d at 213; citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999)), the court presumes that Hubbard has established his prima facie case. In turn, the Warning that Tyco issued to Hubbard on December 29, 2008, see Vanderzanden Aff., Ex. 7 (doc. no. 34-7), contains sufficient evidence of a legitimate nondiscriminatory reason for Hubbard's suspension, i.e., his conversations with fellow employees after talking with management about his altercation with Rogers. Thus, it is necessary to proceed to the third stage of the McDonnell Douglas framework.

27

"To avoid summary judgment at the third stage in the McDonnell Douglas framework, '[Hubbard] must introduce sufficient evidence to support two findings: (1) that [Tyco]'s articulated reason [for suspending him] . . . is a pretext, and (2) that the true reason is discriminatory." Espinal, 693 F.3d at 35 (quoting Udo, 54 F.3d at 13; citing Smith, 40 F.3d at 16; Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001)). While there are several ways in which a Title VII plaintiff may establish pretext, Hubbard focusses on one, his assertion that he was treated less favorably than Derek Thompson, who also spoke with a fellow employee about a matter under investigation, but was not suspended for doing so. His argument is not persuasive.

As a legal matter, "[d]isparate treatment may be 'competent proof that the explanation given for the challenged employment action was pretextual, provided the plaintiff-employee can make a preliminary showing that others similarly situated . . . in all relevant respects were treated [more advantageously] by the employer.'" Aly, 711 F.3d at 46 (quoting Straughn, 250 F.3d at 43-44). Hubbard frames his disparate-treatment argument in the following way:

> Despite the Defendant's denial, there is a specific incident involving both Hubbard and another employee that are identical yet Hubbard was disciplined and the other employee was not. Hubbard

28

> was suspended in December 2008 after he was assaulted by Rogers. Hubbard was allegedly suspended because after speaking with Deroy about the incident, Hubbard allegedly told other employees Rogers might be suspended or lose his job.
>
> In June of 2008, Thompkins, an American, did the exact same thing. Thompkins had spoken with a manager, Matt Labounty, about an incident with another employee named Jake Joslin. Thompkins admitted that after speaking with Labounty, Thompkins told Joslin: "he might find himself looking for another job." There was no indication in the file that Thompkins was ever disciplined in any way, much less being suspended for five days without pay. This is a clear indication that by December of 2008 the Defendant was not interested in listening to Hubbard's complaints about discrimination any longer and instead started to encourage him to leave.

Pl.'s Supp. Mem. of Law (doc. no. 56) 28 (citations to the record omitted). In support of his argument that he and Thompkins were similarly situated, but were treated differently after engaging in similar conduct, Hubbard produced and cites a written statement Thompkins gave to Philip Williams. In it, Thompkins described a conversation he had with another Tyco employee, Jake Joslin. See Pl.'s Mem. of Law, Ex. 2 (doc. no. 39-3), at 49.

Hubbard's argument fails, however, because he and Thompkins were not similarly situated. When basing a pretext argument on disparate treatment, "the plaintiff's case and the comparison cases that [he] advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and

29

circumstances." Straughn, 250 F.3d at 44 (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)). According to the Warning he received, Hubbard was suspended for "having inappropriate conversations with fellow inspectors and operators regarding the incident [with Rogers] after [he, Hubbard] spoke with [his] manager and HR." Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2. The Warning went on to inform Hubbard of his obligation to keep to himself information about ongoing investigations, in the interest of avoiding animosity with fellow employees. See id.

What differentiates Thompkins' conversation with Joslin from the conversation(s) for which Hubbard was suspended is the fact that Thompkins spoke to Joslin at the request of Matt Labounty, a day shift supervisor. See Pl.'s Mem. of Law, Ex. 2 (doc. no. 39-3), at 49. Suffice it to say that an employee spreading rumors about a fellow employee after talking with management is not situated similarly to an employee providing counseling to a fellow employee, at the behest of management. In short, Hubbard has failed to produce evidence of disparate treatment from which a reasonable jury could determine that the reason Tyco gave for suspending him in 2008 was pretextual. Accordingly, Tyco is entitled to judgment as a matter of law on

Hubbard's claim that Tyco discriminated against him on account of his national origin by suspending him.

### b. Hubbard's Discharge

To establish his prima facie case of discrimination based upon his discharge, Hubbard must show that:

> (1) he . . . is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his . . . job; (3) was nevertheless dismissed . . .; and (4) [Tyco] sought someone of roughly equivalent qualifications to perform substantially the same work.

Aly, 711 F.3d at 46 (citing Rodriguez-Torres v. Carib. Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005)).

Tyco argues that Hubbard has failed to establish a prima facie case of discrimination because: (1) his contact with Long on February 6 precludes him from establishing that he was performing his job in a manner that met Tyco's legitimate expectations; and (2) he has not established that he was treated differently than similarly situated employees. Tyco's first argument is directed to the second element of the prima facie case and his second argument appears to be directed toward the fourth element. All agree that Hubbard has established the first and third elements of his prima facie case; his English origin places him in a protected class, and Tyco discharged him.

31

With regard to the second element of the prima facie case, a plaintiff must establish that "he was performing his job at a level that rules out the possibility that he was fired for job performance." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). Tyco identifies Hubbard's communication with Long on February 6 as undisputed evidence that precludes Hubbard from establishing that he was adequately performing his job at the time of his discharge.

However, "[w]hen assessing whether a plaintiff has met [his] employer's legitimate expectations at the prima facie stage of a termination case, 'a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.'" Quinn-Hunt v. Bennett Enters., Inc., 211 F. App'x 452, 457 (6th Cir. 2006) (quoting Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 1999); citing Tysinger v. Police Dep't, 463 F.3d 569, 571 (6th Cir. 2006) ("For purposes of the prima facie analysis, a plaintiff's qualifications are to be assessed in terms of whether he or she was meeting the employer's expectations prior to and independent of the events that led to the adverse action."); Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 585 (6th Cir. 2002)).

Because Tyco identifies nothing other than the February 6 incident to support its argument that Hubbard cannot establish the second element of his prima facie case, the court assumes that Hubbard has established that he was adequately performing his job at the time of his discharge.  Cf. Timm v. Ill. Dep't of Corr., 335 F. App'x 637, 643 (7th Cir. 2009) ("where an employee was fired for a sudden and egregious breach of policy, we assume this prong [i.e., the second element of the prima facie case] has been met") (citing Jones v. Union Pac. R.R. Co., 302 F.3d 735, 742 (7th Cir. 2002); Curry v. Menard, Inc., 270 F.3d 473, 477-78 (7th Cir. 2001)).

With regard to the fourth element of the prima facie case, Hubbard must show that Tyco "sought someone of roughly equivalent qualifications to perform substantially the same work." Aly, 711 F.3d at 46.  While there is significant leeway allowed in terms of how a plaintiff may make the requisite showing, see Rodriguez-Torres, 399 F.3d at 59, it is nonetheless essential to the prima facie case because only a discharge in the face of the employer's continuing need for the services provided by the discharged employee can raise an inference that the discharge was motivated by discriminatory animus, see Loeb v. Textron, Inc., 600 F.2d 1003, 1013 (1st Cir. 1979).  In response to Tyco's argument that he has not established the

33

fourth element of his prima facie case, Hubbard contends that "the Defendant [does not] dispute that the inspections Mr. Hubbard was conducting continued to be performed by others," Pl.'s Supp. Mem. of Law (doc. no. 56) 19-20, and he cites two pages of Tyco's memorandum of law as evidence of Tyco's concession on that point.

There are two problems with Hubbard's position. First, it is Hubbard's burden to establish his prima facie case, and he identifies no record support for his contention that his work continued to be performed by others after his discharge. Second, the two pages of Tyco's memorandum that Hubbard cites do not mention what happened to his duties after he was discharged, and do not include a concession that Hubbard has established the fourth element of his prima facie case.

So, it is far from clear that Hubbard has shown that Tyco "sought someone of roughly equivalent qualifications to perform substantially the same work," Aly, 711 F.3d at 46, after it terminated his employment. Because the burden of establishing a prima facie case is light, see Martinez-Burgos, 656 F.3d at 12, however, the court will presume that Hubbard has established all four elements of his prima facie case.

Turning to the second step of the McDonnell Douglas framework, Tyco contends that Hubbard's communication with Long

34

on February 6, in violation of various directives not to talk with other employees about matters under investigation, was a legitimate nondiscriminatory reason for his discharge. Indeed, the First Circuit has "often found [that] insubordination is obviously sufficient to support an adverse employment action." Pearson, 723 F.3d at 41 (citing Windross v. Barton Protective Servs., Inc., 586 F.3d 98, 104 (1st Cir. 2009)).

Hubbard, however, contends that insubordination was not a legitimate reason for his discharge. He begins by asserting that the "gag order" on which Tyco based its charge of insubordination violated the National Labor Relations Act ("NLRA"). He then argues that "[a]n unlawful reason for terminating an employee is not 'legitimate' and therefore does not shift the burden of production back to the Plaintiff." Pl.'s Supp. Mem. of Law (doc. no. 56) 25.

Hubbard is mistaken in his expansive view illegitimacy. At the second stage of the McDonnell Douglas framework, an employer's reason for discharging an employee "must be 'legitimate' or 'nondiscriminatory,' which means only that it is not a motive that is illegal under Title VII." 1 Rodney A. Smolla, Federal Civil Rights Acts § 9:40, at 1260 (3d ed. 2013) (emphasis added). That is, "[c]ourts . . . limit their inquiry regarding an employer's proffered reason to whether that reason

35

is consistent with the statute at issue [and] do not automatically determine that a decision based on a trait protected by one statute is an illegitimate decision under a statute that protects other traits."  1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 39 (4th ed. 2007) (emphasis in the original).  As the Supreme Court has explained:

> Although some language in our prior decisions might be read to mean that an employer violates the ADEA whenever its reason for firing an employee is improper in any respect, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (creating proof framework applicable to ADEA) (employer must have "legitimate, nondiscriminatory reason" for action against employee), this reading is obviously incorrect.  For example, it cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA.  The employee's race is an improper reason, but it is improper under Title VII, not the ADEA.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 612-13 (1993) (parallel citations omitted); see also 1 Lex K. Larson, Employment Discrimination § 12.09[2], at 12-81 to 12-82 (2d ed. 2012) ("[a]lthough discharge of an employee due to medical reasons may run afoul of other statutes, such employer action is not a Title VII violation if done with an even hand") (citing Hervey v. City of Little Rock, 787 F.2d 1223 (8th Cir. 1986)).  Hazen is dispositive of Hubbard's argument; even if Tyco's "gag order" violated the NLRA, that would not have made Tyco's reason

for terminating Hubbard's employment illegitimate in the context of a claim under Title VII or RSA 354-A:7.

Having presumed that Hubbard has established his prima facie case, and having determined that Tyco's charge of insubordination was a legitimate nondiscriminatory reason for terminating Hubbard's employment, the court turns to the third step in the McDonnell Douglas framework. The court of appeals for this circuit has recently outlined the principles that govern pretext analysis under McDonnell Douglas:

> If the defendant proffers legitimate reasons for the adverse action, the plaintiff must then prove by a preponderance that the proffered reasons by the defendant are a pretext for unlawful discrimination. [St. Mary's Honor Ctr., 509 U.S.] at 507-08. To meet his or her burden, a plaintiff must demonstrate either that the adverse employment action was (1) "more likely motivated" by discrimination than by the explanation proffered by the defendant; or (2) "the proffered explanation [was] unworthy of credence" where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation. Burdine, 450 U.S. at 256.

Aly, 711 F.3d at 46 (parallel citations omitted). Regarding the way in which courts should approach the issue of pretext, the court of appeals has explained:

> "[T]here is no mechanical formula for finding pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (internal quotation marks omitted). Instead, "[i]t is the type of inquiry where 'everything depends on the individual facts.'" Id. at 40 (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999)). The inquiry focuses on whether the employer truly believed its stated reason for

37

taking action adverse to the employee.  See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000).  The plaintiff bears "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (alteration in original) (internal quotation mark omitted).

Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (parallel citations omitted).[4]  In other words, when "assessing whether an adverse employment decision is pretextual, [a court] do[es] not sit as a super-personnel department that reexamines an entity's business decisions."  Espinal, 693 F.3d at 35 (quoting Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); citing Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)) (internal quotation marks omitted).  Rather, the court's task "is limited to determining whether the employer 'believe[d] in the accuracy of the reason given for the adverse employment action.'"  Espinal, 693 F.3d at 35 (quoting Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 76 (1st Cir. 2008); citing Feliciano de la Cruz, 218 F.3d at 7).

---

[4] Kelley involved a retaliation claim brought under the Americans With Disabilities Act, see 707 F.3d at 115, but given that "[a] retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII," id. (citations omitted), and given the Kelley court's citation of a discrimination case in its discussion of pretext analysis, see id. at 116, the legal principles stated in that discussion apply to this court's analysis of Hubbard's Title VII discrimination claim.

Hubbard's discrimination claim fails because he has not carried his burden with regard to either of the two inquiries described in Aly. The court turns to each, in turn.

The first way for a plaintiff to establish pretext, under Aly, is to "demonstrate . . . that the adverse employment action was . . . more likely motivated by discrimination than by the explanation proffered by the defendant." 711 F.3d at 46 (internal quotation marks omitted). The problem here is that Hubbard has produced no evidence that the decision to discharge him was motivated by discrimination. He has produced evidence that the decision to discharge him was made by an executive council composed of Jonathan Dufour, Wilford Roy, DeRoy, Murphy, John Sewell, and an unnamed finance manager. At oral argument, Hubbard conceded that none of those six decisionmakers ever said anything that demonstrated animosity toward people of English origin or toward non-Americans. His best shot at establishing discriminatory animus is a theory he raised for the first time at oral argument, without the benefit of any legal authority. That theory is that the animus of the executive council is established by proof that the council somehow "condoned" national-origin discrimination directed against him by other

39

Tyco employees. Because that argument is both legally and factually unsupported,[5] it does not help Hubbard.

Hubbard correctly argues that he is entitled to support his pretext argument with evidence he produced to establish his prima facie case, see St. Mary's Honor Ctr., 509 U.S. at 511; Espinal, 693 F.3d at 35, but that rule does him no good, because he supported his prima facie case with no evidence of discriminatory animus on the part of those who made the decision to terminate his employment.

In his supplemented memorandum of law, Hubbard makes the following argument, presumably directed to the prima facie case that the decision to discharge him was a product of national-origin discrimination:

> There is no dispute that discrimination was rampant at Tyco. Once Deroy looked into the issues raised by Hubbard, he discovered that the harassing and discriminatory language and behavior were not being reported by management to Human resources. Specifically, the management team of Roy, Williams, Pixley and Coughlin. There is also no dispute that Hubbard was harassed at work and was consistently asking for help. He even considered transferring to get out of the situation. The Defendant argues that the obvious and well documented animus was directed at Hubbard because he was an inspector, not because of his national origin. The Defendant asks the Court to

---

[5] Moreover, it is difficult to square Hubbard's argument that Tyco managers condoned discrimination against him with his own statement of material facts, in which he describes punishments meted out to both Derek Thompkins and Bill Rogers as a result of their abusive behavior toward him, see Pl.'s Supp. Mem. of Law (doc. no. 56) ¶¶ 10-14 (Thompkins), 27-29 (Rogers).

> make this factual finding despite the Defendant's admission that many others were discriminated against because of their race or national origin. The motivation of the individuals harassing Hubbard is a classic instance [of a] genuine issue of material fact and defeats summary judgment.

Pl.'s Supp. Mem. of Law (doc. no. 56) 20 (citations to the record omitted). It is, indeed, well established that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012)) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)); see also Kelley, 707 F.3d at 115-16 (citations omitted). Even so, the evidence Hubbard has produced goes to the animus of his co-workers and subordinates, not to the animus of those on the executive council who were responsible for making the decision to discharge him. In sum, because Hubbard has produced no evidence of anti-English animus on the part of those who made the decision to discharge him, he has not demonstrated that his discharge was motivated by discrimination at all, much less that it was "more likely motivated by discrimination," Aly, 711 F.3d at 46, than by the decisionmakers' belief that he had violated one or more direct instructions from management in his communications with Long on February 6.

41

Hubbard is equally unable to establish pretext under the alternative path described in Aly, that is, by "demonstrate[ing] . . . that the . . . proffered explanation [was] unworthy of credence where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation," 711 F.3d at 46 (internal quotation marks omitted). "Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." Acevedo-Parrilla, 696 F.3d at 141 (quoting Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); citing Reeves, 530 U.S. at 147). That is so because demonstrating that an employer's explanation is unworthy credence goes directly to the central focus of the pretext analysis, i.e., "whether the employer believed its stated reason to be credible," Acevedo-Parrilla, 696 F.3d at 142 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991); citing Gray v. N.E. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986); Feliciano de la Cruz, 218 F.3d at 7); see also Kelley, 707 F.3d at 116.

An explanation is unworthy of credence when is suffers from "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . .' such that a factfinder could 'infer that the employer did not act for the asserted non-

42

discriminatory reasons.'" Santiago-Ramos, 217 F.3d at 56 (quoting Hodgens, 144 F.3d at 168). While recognizing that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent," Acevedo-Parrilla, 696 F.3d at 140 (citations omitted), the court nevertheless concludes that Hubbard has not produced evidence on the believability of Tyco's reason for discharging him from which a reasonable jury could determine that that reason was a pretext.

All agree that Tyco's proffered reason for discharging Hubbard was insubordination, based upon his February 6 communications with Long. That reason is not unworthy of credence. It is undisputed that: (1) in December of 2008, Hubbard was issued a Warning prohibiting him from spreading information concerning ongoing investigation with fellow employees because such "behavior creates animosity with fellow employees," Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2; (2) that Warning was in force until June of 2009; (3) on February 5, DeRoy and Murphy told Hubbard about Long's February 5 statement complaining about Hubbard's approaching him to talk about work-related issues, and asked Hubbard to respond to the issues raised in that statement; (4) on February 6, DeRoy spoke with Hubbard about his relationship with Long, and told him he didn't

"want . . . for any pot to be stirred," Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no. 39-4) 109:14; (5) later that day, and after his meeting with DeRoy, Hubbard engaged in a conversation with Long in which he complained about Long having "the nerve to fucking lie" about him in statements to Tyco officials, id., Ex. 9 (doc. no. 34-9), at 2; and (6) Long was so upset by his conversation with Hubbard that he immediately contacted his supervisor to report it.

Given those undisputed facts, the court concludes, as a matter of law, that Tyco's explanation for terminating Hubbard, insubordination, is not unworthy of credence. That is, Hubbard has produced no evidence that would allow a reasonable factfinder to "infer that [Tyco] did not act for the asserted non-discriminatory reasons." Santiago-Ramos, 217 F.3d at 56 (citation omitted).

Even if Hubbard could demonstrate that insubordination is not a credible explanation for Tyco's decision to discharge him, the record is completely devoid of any evidence that suggests a discriminatory motivation on the part of the executive council, for the reasons stated above.

As with the discrimination claim based upon his suspension, Hubbard appears to argue that the pretextual nature of Tyco's explanation for his discharge is demonstrated by the

44

disparate treatment he received. Specifically, he argues that Tyco's explanation is a pretext for national-origin discrimination because he was discharged for violating instructions not to communicate with Long while Bill Rogers, an American, violated Tyco's Guide to Ethical Conduct ("GEC") and/or its Harassment Free Workplace Policy ("HFW Policy") five times without being discharged, notwithstanding Tyco's policy of discharging an employee upon his or her second violation of the HFW Policy. By Hubbard's own admission, this example of purported disparate treatment is "not as identical as the [Thompkins/Joslin] example." Pl.'s Supp. Mem. of Law (doc. no. 56) 28. The court agrees.

Hubbard was discharged for talking with Long about matters he, Hubbard, had been discussing with management. That conduct took place in early February. Less than two months before that, in late December, Hubbard had been suspended for engaging in identical conduct, and was under a formal Warning not to do so again. That Warning was reiterated hours before Hubbard communicated with Long, when DeRoy told Hubbard that he did not want the pot to be stirred. According to Hubbard, Rogers violated Tyco's GEC and/or its HFW Policy five times between January of 2008 and April of 2009, but was not discharged for

45

any of those violations, notwithstanding Tyco's policy of discharging an employee after a second violation.

While the court understands Hubbard's unhappiness with Tyco's apparent leniency toward Rogers' violations of the GEC and/or the HFW Policy, Rogers is not a valid comparator. Hubbard was discharged for insubordination, but he does not claim that Rogers was ever insubordinate. If some other employee had been allowed to keep his or her job after engaging in hostile communications with another employee, hours after being directed not to stir the pot, and had done so while under a Warning not to discuss ongoing company investigations with other employees, then Hubbard might have a good argument. But here, even if Hubbard is able to prove that Tyco did not follow its own internal guidelines with respect to disciplining Rogers, Hubbard's conduct and Rogers' conduct are so different that Rogers is not a valid comparator for purposes of establishing pretext based upon disparate treatment.

Hubbard also argues that pretext is shown by the fact that he was suspended pending Tyco's investigation of his communications with Long, while Long was not, and the fact that he was discharged as a result of those communications, and Long was not. In Hubbard's view, he and Long engaged in exactly the same conduct, but Tyco treated them differently. Long, however,

is not a valid comparator for at least three reasons.  First, on February 6, Long was not operating under a Warning for having inappropriate communications with coworkers.  Second, at the time of the communications between Hubbard and Long, Long had not been warned against stirring the pot, and Hubbard has identified no reason why he should have been.  And third, in the communications at issue, Hubbard was aggressive and abusive, while Long was not.  So, like Rogers, Long is not a valid comparator.  Because neither Rogers nor Long is a valid comparator, Hubbard has failed to produce evidence on disparate treatment from which a reasonable jury could determine that the reason Tyco gave for discharging him was pretextual.

Finally, taking a step back from formal legal analysis, Count IV also founders when viewed from the perspective of basic common sense.  Tyco hired Hubbard despite the fact that he is English.  Thereafter, according to Hubbard himself, he became "the fastest guy in the company's history ever to go in there and became a T3 to T1," Def.'s Facts (doc. no. 32) ¶ 13 (quoting Def.'s Mem. of Law, Ex. D, Hubbard Dep. (doc. no. 32-4) 64:13-14).  It defies both logic and the undisputed facts of this case to argue that the same company that hired Hubbard and rapidly promoted him, while knowing him to be English, then discharged him because of his national origin.  See LeBlanc, 6 F.3d at 847

("LeBlanc points to nothing in the record to suggest why Conte, who, in January 1989, approved LeBlanc's transfer, at Great American's expense . . . and his corresponding sixteen percent pay raise, would develop an aversion to older people less than two years later . . . ."); Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" (quoting Donohue & Siegelman, The Changing Nature of Employment Discrimination Litigation, 43 Stan. L. Rev. 983, 1017 (1991)).

To conclude, Hubbard has established that he is English and that Tyco discharged him, but he has come nowhere close to producing evidence that would allow a reasonable jury to conclude that the reason Tyco gave for discharging him was a pretext for national-origin discrimination. As a result, his discrimination claim fails at stage three of the McDonnell Douglas framework. Accordingly, Tyco is entitled to judgment as a matter of law on the discrimination claim stated in Count IV.

3. Retaliation (Counts V and VI)

In the fact section of his complaint, Hubbard alleged that he reported incidents of workplace discrimination to his

48

superiors on two occasions in September of 2008, see Compl. (doc. no. 1) ¶¶ 19 & 20, and did so on three more occasions, in November and December of 2008, see id. ¶¶ 21 & 22, and again at some point after he returned from his late-December suspension, see id. ¶ 24.

In his complaint, Hubbard asserted his state-law retaliation claim in the following way:

> As more particularly described above, immediately upon the heels of the Plaintiff telling the Defendant that he was being discriminated against based on his national origin, the Defendant began a pattern of retaliatory conduct toward the Plaintiff as described herein.

> The culmination of the retaliation was that the Plaintiff was terminated.

> The Defendant's unlawful retaliation against the Plaintiff for reporting discrimination based on national origin violates N.H. RSA 354-A:7, I.

Compl. (doc. no. 1) ¶¶ 48-50. He asserted his federal retaliation claim in a similar fashion:

> As more particularly described . . . above, the defendant has likewise willfully violated Title VII, 42 U.S.C. Section 2000(e) et seq. by retaliating against the Plaintiff for complaining about discrimination based on his national origin and then engaging in a pattern of retaliatory conduct toward him, culminating in termination.

Id. ¶ 53. While both of Hubbard's claims refer to "a pattern of retaliatory conduct," the fact section of his complaint identifies no potentially retaliatory adverse employment action

49

other than his discharge, and it does not indicate what other actions by Tyco contributed to the pattern of conduct to which he refers.

In his supplemented memorandum of law, Hubbard appears to assert, seemingly in passing, two additional theories of retaliation. First, in his argument that Tyco's reason for discharging him was not legitimate, Hubbard appears to suggest that if he was discharged for his February 6 communications with Long, that would have been an act of retaliation in violation of Title VII. See doc. no. 56, at 25. If, indeed, Hubbard is making such a claim, the court is quite confident that Hubbard's communications with Long do not qualify as protected conduct for the purpose of a Title VII retaliation claim. In addition, in the section of his supplemented memorandum actually devoted to retaliation, Hubbard concludes this way:

> In this case, Plaintiff complained repeatedly to his supervisors and directors. No action was taken until Coughlin claimed that Hubbard was seeking legal assistance. Within seven days of that report by Coughlin, Hubbard was terminated.

Pl.'s Supp. Mem. of Law (doc. no. 56) 36. Based upon the foregoing, the court assumes that: (1) Hubbard is now claiming that he was discharged because relevant Tyco decisonmakers believed that he had either considered retaining counsel or had actually done so, despite the lack of any support for such a

50

claim in the factual allegations he made in his complaint; and (2) such an action by Tyco would violate Title VII, despite the lack of any legal authority for that proposition in Hubbard's supplemented memorandum of law. However, adding Hubbard's new claim to the one actually stated in his complaint does him no good because that claim fails just as his original claim fails, due to his failure to establish that his discharge was causally related to his purported protected conduct.

Count V arises under RSA 354-A, while Count VI arises under Title VII. As with Counts III and IV, the court will conduct a single analysis under the standard applicable to Title VII. See Hudson, 822 F. Supp. 2d at 92. "Title VII makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice." Gerald, 707 F.3d at 24 (citing 42 U.S.C. § 2000e-3(a)).

In a recent Title VII retaliation case, the court of appeals for this circuit outlined the applicable analytical approach:

> Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of retaliation by showing that (1) she engaged in protected conduct, (2) she was subject to an adverse employment action, and (3) a causal connection existed between the first and second elements. Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). The burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its challenged actions." Provencher v. CVS Pharmacy, Div.

of Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)). Finally, "[i]f the defendant does so, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).

Colón v. Tracey, 717 F.3d 43, 49 (1st Cir. 2013) (parallel citations omitted). The court then went on to note that "[a]s the appropriate standard for causation in a Title VII employment retaliation claim is not at issue here, we acknowledge but need not address the Supreme Court's recent grant of certiorari in University of Texas Southwestern Medical Center v. Nassar," Colón, 717 F.3d at 49 n.14.

Shortly after the First Circuit decided Colón, the Supreme Court decided Nassar. In its decision, the Court ruled:

Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

133 S. Ct. 2517, 2533 (2013); see also Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008) (explaining, in ADEA discrimination claim, that for factor to be "but for" cause of employee's discharge, it must have been "the determinative factor in his discharge") (quoting Dávila, 498 F.3d at 15; citing Mesnick, 950 F.2d at 823) (emphasis added). That is a

52

more demanding causation standard than the one that applies to Title VII discrimination claims, under which a plaintiff need only establish that discriminatory animus was a motivating factor for an adverse employment action. See Nassar, 133 S. Ct. at 2526, 2534. Given the substantial difference between motivating-factor causation and but-for causation, the court cannot agree with Hubbard that the Nassar decision has little or no effect on the analysis of his retaliation claims.

However, it is not entirely clear where the analysis of causation fits into the McDonnell Douglas framework as applied to Title VII retaliation claims. As Colón describes that framework, it appears that causation must be considered: (1) at stage one of the McDonnell Douglas framework, as the third element of the prima facie case; and (2) at stage three, as a part of the plaintiff's ultimate burden. The court will assume without deciding that Hubbard has produced adequate evidence to establish his prima facie case, and move to the second and third stages of the McDonnell Douglas framework. For the reasons given in the previous section, Tyco has met its burden of producing evidence of a legitimate nondiscriminatory reason for its decision to discharge Hubbard. That leaves the third stage of the framework.

53

While the court of appeals for this circuit has yet to decide a Title VII case that involves an application of Nassar, useful guidance on how Nassar might be applied to the third stage of a McDonnell Douglas analysis may be derived from the First Circuit's opinion in McArdle v. Town of Dracut/Dracut Public Schools, 732 F.3d 29 (1st Cir. 2013).  In that case, the plaintiff asserted a retaliation claim under section 105(a)(1) of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615(a)(1).  The court described the elements of McArdle's claim:

> "To make out a prima facie case of retaliation [McArdle] must show (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action."  [Hodgens v. Gen. Dynamics Corp., 144 F.3d 151,] 161 [1st Cir. 1998)] (applying the standard from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to FMLA cases).

732 F.3d at 35 (parallel citations omitted).  In McArdle, the employee claimed that he was discharged "because he asked for FMLA leave."  Id.  The court of appeals, however, determined that "he was fired because the town concluded that his renewed and indefinite absence [from work], without advance notice, allowed it to fire him."  Id.  The court continued:

> The correctness of this conclusion is underscored by imagining that McArdle had made no request at all for FMLA leave.  In such a scenario, the town's claim

54

that he was abandoning his job without effectively establishing a right to do so would have been indisputably correct. He would have been terminated, perhaps sooner. Alternatively, imagine that McArdle had asked for FMLA leave while still showing up for work. There is no evidence to which he points that would support any inference that the town would have still fired him, or even thought that it could fire him under the terms of the collective bargaining agreement. In short, even assuming that he properly requested FMLA leave that request could not have caused his termination. His absence from work, on the other hand, was fully sufficient to cause his termination. Cf. Soto-Padro v. Pub. Bldgs. Auth., 675 F.3d 1, 6 (1st Cir. 2012) ("'if the lawful reason alone would have sufficed to justify the [action],' '[t]hen the employee cannot prevail.[']") (quoting McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 359 (1995)). This conclusion "comports with the traditional tort-law principle that if the wrongful act did not cause the injury, the wrongdoer is not liable." Tejada-Batista v. Morales, 424 F.3d 97, 101 (1st Cir. 2005).

McArdle, 732 F.3d at 36 (parallel citations omitted).

The application of McArdle to the facts of this case is straightforward. If Hubbard had not reported discrimination to Tyco, Tyco's claim that Hubbard had acted insubordinately by contacting Long would have been indisputably correct, for reasons developed in the previous section. On the other hand, if Hubbard had complained about discrimination but not contacted Long on February 6, "[t]here is no evidence . . . that would support any inference that [Tyco] would have still fired him," 732 F.3d at 36. To the contrary, Hubbard himself asserts that he had complained about discrimination at Tyco for months prior

55

to the February 6 incident, without suffering any adverse employment action or being given any reason to believe that such adverse actions might result from such conduct on his part. Rather, it is undisputed that Tyco's response to Hubbard's protected conduct was to begin an investigation, albeit not as quickly as Hubbard might have liked. In short, because Hubbard's contact with Long, alone, gave Tyco a credible reason for discharging him, Hubbard cannot establish that but for his protected conduct he would not have been discharged.

Hubbard's only argument on causation is that the requisite causal link between his protected conduct and his discharge is the short span of time between his meeting with DeRoy and Murphy on February 4 and his discharge on February 12. It is well established that "[t]emporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 32 (1st Cir. 2011) (quoting DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008); citing Collazo v. Bristol-Myers Squibb Mfg., Inc., 671 F.3d 39, 49-50 (1st Cir. 2010); Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007)); see also Gerald, 707 F.3d at 25 (citing Harrington v. Agg. Indus. Ne. Region, Inc., 668 F.3d 15, 32 (1st Cir. 2012)). Temporal proximity, alone, however, is insufficient to establish

56

causation at the third stage of the McDonnell Douglas framework. See Alvarado, 687 F.3d at 464 (accepting one-week interval between protected conduct as sufficient to establish third element of prima facie case, but insufficient to establish causation at stage three of McDonnell Douglas framework) (citing Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)).

Absent any evidence of causation other than temporal proximity, Hubbard has failed to produce evidence sufficient to send his retaliation claim to a jury. Accordingly, Tyco is entitled to judgment as a matter of law on the claims stated in Counts V and VI.

## Conclusion

As the court explained at the outset of this order, Tyco's motion to strike, document no. 57, is denied as moot, and Hubbard's motion to correct the record, document no. 65, is granted. For the reasons detailed above, Tyco is entitled to judgment as a matter of law on Hubbard's discrimination and retaliation claims, but not the hostile-work-environment claims stated in Counts II and III. Thus, Tyco's motion for summary judgment, document no. 30, is granted in part and denied in part; the case remains on track for a trial on Counts II and

III.  The court concludes by noting that the elimination of Counts IV, V, and VI from this case may provide a good opportunity for mediation of the two claims that remain.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

December 3, 2013

cc:   Nicole S. Corvini, Esq.
      Lisa Hall, esq.
      Michael S. McGrath, Esq.
      Danielle Y. Vanderzanden, Esq.